# Supreme Court of Florida

_____

No. SC13-411
_____

**CITRUS COUNTY HOSPITAL BOARD, etc., et al.**,
Appellants,

vs.

**CITRUS MEMORIAL HEALTH FOUNDATION, INC., etc.**,
Appellee.

[November 13, 2014]

**POLSTON**, J.

This case is before the Court on appeal from the First District Court of Appeal's decision in Citrus Memorial Health Foundation, Inc. v. Citrus County Hospital Board, 108 So. 3d 675 (Fla. 1st DCA 2013), which held that the special law enacted at chapter 2011-256, Laws of Florida, impairs the Foundation's contracts in violation of article I, section 10 of the Florida Constitution.[1] For the reasons below, we affirm the First District's decision.

---

1. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

# I. BACKGROUND

In 1949, the Florida Legislature created the Citrus County Hospital Board, an independent special district charged with operating a public hospital in Citrus County, Florida. In 1990, the Hospital Board utilized section 155.40, Florida Statutes, which was enacted in 1982 and authorizes county hospital districts to lease their hospitals to specified Florida business entities so that public hospitals may more effectively compete with private hospitals.

Specifically, through two contracts—a lease and an agreement for hospital care—the Hospital Board turned the hospital's operation and management over to the Citrus Memorial Health Foundation, Inc., a Florida not-for-profit corporation incorporated in 1987 under chapter 617, Florida Statutes. Transferring control of the hospital to the Foundation through these agreements, which are effective until 2033, allows the hospital to avoid participating in the State retirement program and to engage in joint ventures previously not available to it because of the Hospital Board's public status. The Foundation has likewise benefited from its relationship with the Hospital Board, by for example, using its status as the operator of a public hospital and its accountability to the Hospital Board to obtain sovereign immunity and recalculate its Medicaid rates.

Though the Hospital Board and Foundation are legally separate entities, the Hospital Board has been involved in various ways with the Foundation's activities.

For example, the Hospital Board facilitated the Foundation's incorporation, and the Foundation's original articles of incorporation listed among its purposes "[t]o operate exclusively for the benefit of and to carry out the purposes of but not in any way as an agency of the Citrus County Hospital Board." Further, for many years after the Foundation's incorporation, including in 1990 when the lease and agreement for hospital care were executed, the Hospital Board, through its five trustees, held the majority position on the Foundation's governing board. Significantly, however, the Foundation later amended its articles of incorporation to eliminate the Hospital Board's majority position.

Thereafter, disputes arose between the parties. In 2011, the Legislature became involved and enacted chapter 2011-256, Laws of Florida, based on its determinations that "meaningful oversight by the hospital board is necessitated in light of the [Foundation's] status as an instrumentality of the hospital district," that "restoration of meaningful hospital board representation on the board of the [Foundation] and implementation of appropriate accountability and oversight by the hospital board are necessitated in order to ensure the sovereign immunity status of the [Foundation] as an instrumentality of the hospital district," and that "the ability of the hospital board to continue to act in the public interest on behalf of the taxpayers of Citrus County requires mechanisms to ensure adherence to the hospital board's public responsibilities." Ch. 2011-256, Laws of Fla.

In pertinent part, section 3 of the special law reenacts the Hospital Board's charter. Section 16 of the charter includes fifteen subsections that, for the first time, specifically address the Hospital Board's relationship with the Foundation (or any future lessee) and that are "in addition to the requirements for any [] lease set forth in section 155.40." Ch. 2011-256, § 3(16), at 59-60, Laws of Fla. For example, these provisions (i) require the Hospital Board to approve the Foundation's articles of incorporation and bylaws (including those currently in effect)—section 16(2); (ii) require the Foundation to amend its articles of incorporation so that the Hospital Board's trustees constitute a majority of its voting directors—section 16(5); (iii) require the Hospital Board to approve all Foundation directors, including current directors—section 16(6); (iv) require the Hospital Board to approve certain borrowing, indebtedness, policies, budgets, capital projects, and expenditures—sections 16(8) and (10); (v) require the Hospital Board to approve the Foundation's annual and operating capital budget—section 16(9); (vi) allow the Hospital Board to order, at the Foundation's expense, an independent audit of the Foundation's fiscal management of the hospital—section 16(11); and (vii) require that any dispute between the Foundation and the Hospital Board be subject to the statutory procedures applicable to governmental disputes—section 16(15).

- 4 -

The Foundation filed suit against the Hospital Board and the State in circuit court challenging the special law and seeking, among other things, a declaratory judgment that section 16 of the Hospital Board's charter as enacted in section 3 of the special law applies to impair its articles of incorporation, lease, and agreement for hospital care in violation of article I, section 10 of the Florida Constitution. After dismissing the State as a party, the circuit court granted summary judgment for the Hospital Board based on its conclusions that the Foundation is prohibited from challenging the constitutionality of the special law because it is a public or quasi-public corporation and that the special law does not impair the Foundation's contracts.

On appeal, the First District reversed, holding that, as applied to the Foundation, the special law "significantly alters the parties' contractual rights and is an unconstitutional impairment of their contracts so as to be prohibited by [a]rticle I, [s]ection 10." Citrus Mem'l, 108 So. 3d at 676.

## II.  ANALYSIS

The dispositive issues before this Court are whether the contract clause of the Florida Constitution applies to the Foundation's contracts and, if so, whether, as applied, the special law unconstitutionally impairs the Foundation's contracts. As explained below, we resolve both of these issues in the Foundation's favor.

### A.  The Contract Clause Applies to the Foundation's Contracts

As a threshold matter, both the Hospital Board and the State argue that the Foundation should not be heard to complain about the special law's alleged impairment of its contracts because it is a public or quasi-public corporation and therefore not entitled to protection under the contract clause. We disagree.[2]

Article I, section 10 of the Florida Constitution provides that "[n]o . . . law impairing the obligation of contracts shall be passed." As part of the Florida Constitution's Declaration of Rights, this right belongs to the people, including corporations, as against the government. See Traylor v. State, 596 So. 2d 957, 963 (Fla. 1992) (explaining that "[e]ach right" in the Declaration of Rights is "a distinct freedom guaranteed to each Floridian against government intrusion" and "operates in favor of the individual, against [the] government"); see also State Farm Mut. Auto. Ins. Co. v. Gant, 478 So. 2d 25, 26 (Fla. 1985) (applying the contract clause to a corporation).

Although Florida law is clear that corporations, like individuals, are entitled to protection under the contract clause, this Court has not addressed whether the contract clause protects a corporation that has contracted with a hospital district under section 155.40, Florida Statutes, to operate and manage a public hospital. In other contexts not involving the contract clause, Florida courts have precluded

---

2. We review whether the contract clause applies to the Foundation's contracts de novo. See Dep't of Educ. v. Lewis, 416 So. 2d 455, 458 (Fla. 1982).

State agencies and local governments from challenging the constitutionality of certain legislation. For example, in Department of Education v. Lewis, this Court held that "State officers and agencies must presume legislation affecting their duties to be valid, and do not have standing to initiate litigation for the purpose of determining otherwise." 416 So. 2d 455, 458 (Fla. 1982) (addressing a challenge to an appropriations law under article III, section 12 of the Florida Constitution); see also Fla. Dep't of Agric. & Consumer Servs. v. Miami-Dade Cnty., 790 So. 2d 555, 558 (Fla. 3d DCA 2001) (relying on Lewis to hold that county and city lacked standing under article I, section 12 of the Florida Constitution to challenge the constitutionality of the statutory citrus eradication program).

Further, in O'Malley v. Florida Insurance Guaranty Ass'n, 257 So. 2d 9, 11 (Fla. 1971), this Court examined whether a legislatively-created corporation was public or private for purposes of an alleged violation of article III, section 11(a)(12), which prohibits a special law or general law of local application pertaining to or granting any privilege to a private corporation. In so doing, we distinguished private and public corporations as follows:

> Private corporations are those which have no official duties or concern with the affairs of government, are voluntarily organized and are not bound to perform any act solely for government benefit, but the primary object of which is the personal emolument of its stockholders.
> Examples of public corporations in Florida are: the rural electrical cooperatives, city housing authorities, The Inter-American Cultural and Trade Center Authority, the Soil and Water Conservation

Districts, and the Jacksonville Expressway Authority. Their business ordinarily is stipulated by the Legislature to fill a public need without private profit to any organizers or stockholders. Their function is to promote the public welfare and often they implement governmental regulations within the state's police power. In a word, they are organized for the benefit of the public.

O'Malley, 257 So. 2d at 11 (citations omitted); see also Forbes Pioneer Boat Line v. Bd. of Com'rs of Everglades Drainage Dist., 82 So. 346 (Fla. 1919) (discussing public, quasi-public, and private corporations in determining that the legislatively-created board of commissioners of the drainage district was a "public quasi corporation" that had only the authority delegated to it by law).

However, our decision in O'Malley did not address a corporation's standing to allege a contract clause violation. Further, unlike the legislatively-created corporation at issue in O'Malley, the Legislature did not create the Foundation, and the Foundation is not a State agency or local government. Instead, the Foundation was incorporated as a not-for-profit corporation under chapter 617, Florida Statutes, just as any other Florida not-for-profit corporation would be, for the specific purpose of taking control of the public hospital—by contract—as authorized by section 155.40. Moreover, while there is no indication that the corporation in O'Malley was created to avoid obligations applicable to public entities, even though the Foundation operates a hospital for the public's benefit,

- 8 -

spends public money,[3] and uses public property in the process, it "was used by the [Hospital] Board for the express purpose of avoiding statutory and constitutional limitations which would pertain to the [Hospital] Board as a public entity." Citrus Mem'l, 108 So. 3d at 677. Given that the very purpose of section 155.40 is to contractually transfer control of public hospitals to entities like the Foundation, we refuse to apply O'Malley in a way that would effectively render the contracts used to accomplish this purpose meaningless. See Pan-Am Tobacco Corp. v. Dep't of Corr., 471 So. 2d 4, 5 (Fla. 1984) (recognizing that "[w]here the [L]egislature has, by general law, authorized entities of the state to enter into contract or to undertake those activities which, as a matter of practicality, require entering into contract, the [L]egislature has clearly intended that such contracts be valid and binding on both parties").

We also refuse to rely on representations about the Foundation's status that the parties have made in different contexts over the years to impute the Hospital Board's status onto the Foundation. The parties' representations simply do not alter the fact that the Foundation is not a creature of the Legislature and is a

_____

3. Under the agreement for hospital care, the Foundation must submit its annual operating and capital budgets to the Hospital Board so that the Hospital Board may determine, "in its discretion," the amount of tax funds necessary for the Foundation to meet its obligation to provide hospital services for Citrus County residents and appropriate that amount to the Foundation. From 2006-2010, on average, tax funds received from the Hospital Board comprised less than 5% per year of the Foundation's total revenues and did not exceed 6.3% in any year.

distinct legal entity from the Hospital Board. Nor do the facts that the Hospital Board was involved with the Foundation's incorporation, previously controlled its board, and is its sole member somehow remove the Foundation's contracts from the protection afforded by the contract clause.

Accordingly, we hold that the contract clause applies to the Foundation's contracts.

## B. The Special Law Unconstitutionally Impairs the Foundation's Contracts

The Hospital Board and the State next argue that, even if the contract clause applies, the First District erred by concluding that the special law unconstitutionally impairs the Foundation's articles of incorporation, lease, and agreement for hospital care. We disagree and hold that, as applied to these contracts, section 16 of the Hospital Board's charter as enacted in section 3 of the special law is unconstitutional.[4]

The contract clause prohibits any "law impairing the obligation of contracts." Art. I, § 10, Fla. Const. We have defined impairment

> as meaning to make worse; to diminish in quantity, value, excellency, or strength; to lessen in power; to weaken. Whatever legislation lessens the efficacy of the means of enforcement of the obligation is an impairment. Also if it tends to postpone or retard the enforcement of the contract, it is an impairment.

---

4. We apply a de novo standard of review. See Scott v. Williams, 107 So. 3d 379, 384 (Fla. 2013).

- 10 -

State ex rel. Woman's Benefit Ass'n v. Port of Palm Beach Dist., 164 So. 851, 856 (Fla. 1935) (emphasis omitted). And we have "generally prohibited all forms of contract impairment." State, Dep't of Transp. v. Edward M. Chadbourne, Inc., 382 So. 2d 293, 297 (Fla. 1980); see also Dewberry v. Auto-Owners Ins. Co., 363 So. 2d 1077, 1080 (Fla. 1978) ("Any conduct on the part of the [L]egislature that detracts in any way from the value of the contract is inhibited by the Constitution." (quoting Pinellas Cnty. v. Banks, 19 So. 2d 1, 3 (Fla. 1944))).

Section 16 of the Hospital Board's charter as enacted in section 3 of the special law meets our definition of impairment. It eliminates the Foundation's ability to operate and manage the hospital as it has contracted to do by turning the Foundation's governance over to the Hospital Board in disregard of the Foundation's status as a separate legal entity.[5] See generally Marion Mortg. Co. v. State, 145 So. 222, 223 (Fla. 1932) (agreeing that a corporate charter "is a contract between the state and [the corporation], which contract cannot be impaired by the Legislature"). And it also obligates the Foundation to comply with public

_____

5. For example, the special law requires the Hospital Board to approve the Foundation's articles of incorporation and bylaws (including those currently in effect); requires the Foundation to amend its articles of incorporation so that the Hospital Board's trustees constitute a majority of the Foundation's voting directors; and requires the Hospital Board to approve all Foundation directors, including current directors. See ch. 2011-256, §§ 3(16)(2), (5), (6), at 59, Laws of Fla.

- 11 -

accountability and financial responsibility measures that are mentioned nowhere in the parties' agreements and that are "in addition to the requirements for any [] lease set forth in section 155.40."[6] Ch. 2011-256, § 3(16), at 59, Laws of Fla. In other words, as the First District cogently stated, the special law "is a rewrite of the parties' contractual agreements and the imposition of further obligations on the Foundation, while permitting the [Hospital] Board's privatization of hospital management functions as [authorized by section 155.40]." Citrus Mem'l, 108 So. 3d at 678.

In light of this impairment, we hold that section 16 of the Hospital Board's charter as enacted in section 3 of the special law is unconstitutional as applied to the Foundation's contracts. See Cohn v. Grand Condo. Ass'n, Inc., 62 So. 3d 1120, 1122 (Fla. 2011) (affirming the district court's decision that a state statute was unconstitutional "because [it] impairs the obligation of contract as applied to [the plaintiff]"); see also Dewberry, 363 So. 2d at 1080 ("It is axiomatic that

---

6. The special law requires the Hospital Board to approve the Foundation's annual and operating capital budget as well as certain borrowing, indebtedness, policies, budgets, capital projects, and expenditures of the Foundation; allows the Hospital Board to order, at the Foundation's expense, an independent audit of the Foundation's fiscal management of the hospital; and requires that any dispute between the Foundation and the Hospital Board be subject to the statutory procedures applicable to governmental disputes. Id. §§ 3(16)(8)-(11), (15), at 59-60.

subsequent legislation which diminishes the value of a contract is repugnant to our Constitution.").

## III. CONCLUSION

For the foregoing reasons, we affirm the First District's decision.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

Because I conclude that Citrus Memorial Health Foundation, Inc., is a public corporation that is subject to legislative control, I dissent. I would quash the decision of the First District and adopt the analysis contained in Judge Ray's well-reasoned dissent.

The Citrus County Hospital Board has aptly described "[t]he overarching question in this case" as "whether an entity created by a public body for the sole purpose of conducting a public function involving public property and funded by public money can unilaterally remove itself from legislative oversight of the use of public money and the operation of the public function." Citrus Cnty. Hosp. Bd., Inc. v. Citrus Mem'l Health Found., Inc., No. SC13-411, Initial Brief of Appellant at 1 (Fla. Apr. 29, 2013). That question should be answered in the negative. The

- 13 -

majority's decision to the contrary departs from the understanding of the constitutional prohibition on laws impairing the obligation of contracts that has been established for nearly two centuries. The result is that the Legislature is ousted from its proper role of ensuring that the governmental activities of the Hospital Board and the Foundation are conducted in accord with the public interest.

In Trustees of Dartmouth College v. Woodward, 17 U.S. 518 (1819), the Supreme Court recognized that the prohibition on state legislation impairing the obligation of contracts does not proscribe legislative interference with contractual rights of public corporations. In deciding that Dartmouth College was a private charity whose corporate charter was subject to the protection of the Contract Clause, the court relied on a distinction between public and private corporations. In his opinion for the court, Chief Justice Marshall acknowledged that "the framers of the [C]onstitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government." Id. at 629. Accordingly, Chief Justice Marshall reasoned that

> [i]f the act of incorporation [of Dartmouth College] be a grant of political power, if it create a civil institution, to be employed in the administration of the government, or if the funds of the college be public property, . . . the subject is one in which the legislature of the state may act according to its own judgment, unrestrained by any limitation of its power imposed by the [C]onstitution of the United States.

- 14 -

Id. at 629-30.

Chief Justice Marshall went on, however, to conclude that Dartmouth was not such a "civil institution" but was instead "a private eleemosynary institution," the funds of which "consisted entirely of private donations." Id. at 632-41. Chief Justice Marshall explained that the grant by government of a "charter of incorporation" did not determine the "character of the institution." Id. at 638. It thus could not be concluded that Dartmouth had the character of a civil institution simply on the ground that it had been granted a royal corporate charter. "The incorporating act" did not "change the character of a private eleemosynary institution" into a civil institution. Id. at 638-39. In elucidating this conclusion, Chief Justice Marshall observed:

> The character of civil institutions does not grow out of their incorporation, but out of the manner in which they are formed, and the objects for which they are created. The right to change them is not founded on their being incorporated, but on their being the instruments of government, created for its purposes. The same institutions, created for the same objects, though not incorporated, would be public institutions, and, of course, be controllable by the legislature.

Id. at 638 (emphasis added).

Chief Justice Marshall thus accepted the view that "laws concerning civil institutions . . . must change with circumstances, and be modified by ordinary legislation" and that such laws "deeply concern the public." Id. at 627. "[T]o preserve good government, the public judgment must control" with respect to such

- 15 -

laws.  Id.  If the Contract Clause were allowed to encroach into the realm of a

state's regulation of its civil institutions, "the clause would be an unprofitable and

vexatious interference with the internal concerns of a State."  Id. at 628.  No

conceivable reason supports interpreting Florida's Contract Clause differently.

And the logic of Chief Justice Marshall's reasoning regarding the Contract Clause

defeats any due process claim against a state by a public corporation of the state.

Here, the Foundation is a civil institution—that is, a public corporation—and

therefore is "controllable by the legislature."  Its status as a public corporation, an

"instrument[] of government," is made manifest by "the manner in which [it was]

formed, and the objects for which [it was] created."  Woodward, 17 U.S. at 638.

Judge Ray described the undeniable realities of the Foundation's existence:

> [The Foundation] was not voluntarily created by private citizens for
> their own benefit or for the benefit of any private interests whatsoever.
> As the Foundation has admitted, the Hospital Board created the
> Foundation for the purpose of fulfilling the Hospital Board's public
> function of providing hospital services in Citrus County, and it still
> exists for that sole purpose.  The Foundation has no shareholders, and
> the Hospital Board is its only member.  As the Hospital Board has
> aptly described the relationship, the Hospital Board essentially
> restructured itself when it executed the Lease Agreement and
> Agreement for Hospital Care.  This situation was not one where a
> special taxing district competitively bid the outsourcing of a public
> function and entered into [an] "arm's length" bilateral contract with a
> private company.

Citrus Mem'l Health Found., Inc., 108 So. 3d at 680.

- 16 -

It is of no significance that the Foundation was organized by the Hospital Board as a not-for-profit corporation under chapter 617, Florida Statutes, and not established directly by an act of the Legislature. There is simply no authority to support the conclusion that a not-for-profit corporation formed under chapter 617 will—simply because of that formality—be legally deemed not to be a public corporation. As Judge Ray further explained: "[W]hether a corporation is created directly by the State, or by an arm of the State, seems to be a distinction without a difference when, as here, the sole and exclusive purpose of the corporation is to carry out a public function for the benefit of the public." Id. The Foundation may have been structured to avoid certain requirements that might otherwise have fallen on the Hospital Board as a governmental entity, and the Foundation may have received some charitable contributions. But those circumstances do not alter the essential character of the Foundation. The creation of the Foundation by the Hospital Board for a governmental purpose points to the inescapable conclusion that—for purposes of the Contract Clause—the Foundation is a public corporation. The opposite conclusion reached by the First District and the majority exalts incidental circumstances over the essential character of the Foundation.

At bottom, as Judge Ray recognized, there is no private property interest or right that is impaired by the legislation affecting the Foundation that the majority declares unconstitutional. As Chief Justice Marshall stated, the Contract Clause

was designed "to restrain the legislature in [the] future from violating the right to property" and therefore concerns "contracts respecting property, under which some individual could claim a right to something beneficial to himself." Woodward, 17 U.S. at 628. No one can make such a claim here. Any person involved with the Foundation was chargeable with knowledge that the Foundation was established as a public corporation to carry out a governmental purpose, as distinct from a private not-for-profit corporation established to carry out private charitable activities. Whatever private interest any person—including those who made charitable contributions—might assert regarding the relationship between the Hospital Board and the Foundation is negated by the public character of the Foundation.

In this context, the majority's application of the Contract Clause does not protect any private contract right. Instead, it results in "an unprofitable and vexatious interference with the internal concerns of a State." Id. at 628.

An Appeal from the District Court of Appeal – Statutory or Constitutional Invalidity

First District - Case No. 1D12-858

(Leon County)

Barry Scott Richard of Greenberg Traurig, P.A., Tallahassee, Florida, and William John Grant of the Law Office of Grant & Dozier, Inverness, Florida, on behalf of the Citrus County Hospital Board; and Pamela Jo Bondi, Attorney General, Enoch Jonathan Whitney, Assistant Attorney General, Diane G. DeWolf, Deputy Solicitor General, and Rachel Erin Nordby, Deputy Solicitor General, Tallahassee, Florida, on behalf of the State of Florida,

     for Appellants

Peter D. Webster and Christine Davis Graves of Carlton Fields, P.A., Tallahassee, Florida, and Sylvia H. Walbolt and Gary L. Sasso of Carlton Fields, Tampa, Florida,

     for Appellee